RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
DATE 5/18/11

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| WADE GARNER, SR., <br> Plaintiff | CIVIL ACTION <br> SECTION "P" <br> NO. 1:08-CV-01977 |
| VERSUS | |
| WINN CORRECTIONAL CENTER, et al., <br> Defendants | MAGISTRATE JUDGE JAMES D. KIRK |

O P I N I O N

Before the court is a civil rights complaint filed by pro se plaintiff Wade Garner, Sr. ("Garner"), in forma pauperis, on December 17, 2008. The named defendants are Winn Correctional Center ("WCC") in Winnfield, Louisiana, Corrections Corporation of America ("CCA")(the private operator of WCC), Warden Tim Wilkinson ("Wilkinson")(warden of WCC), and numerous employees of WCC, Lt. Vernon, Officer Woo, Officer Smith, LPN Lesia Jones, Pat Thomas, Captain Coleman, Virgil Lucas, and Officer Richard Clark. Garner contends that, while he was confined in WCC on July 30-31, 2008, he was denied medical care for a medical emergency involving severe stomach pain and fever. For relief, Garner asks for monetary compensatory damages, punitive damages, and injunctive relief.

Garner contends that, on July 31-31, 2008, while he was housed in the Cypress Unit at WCC, his requests for emergency medical assistance were ignored by Officer Smith and Lt. Vernon the night

5

of July 30, 2008, and by LPN Jones, Capt. Coleman, and Officer Clark the morning of July 31, 2008. Garner contends that he saw Dr. Pacheco at 4:00 p.m. on July 31, 2008, by making a standard request for medical care, and that Dr. Pacheco sent him to the emergency room at Huey P. Long Hospital, where he had his ruptured appendix removed. Garner contends he remained in the hospital for three weeks.

Garner's claims against WCC, CCA, Lt. Vernon, Officer Woo, LPN Jones, Pat Thomas, and Warden Wilkinson were dismissed on May 26, 2009 (Doc. 10). However, on June 10, 2009, Garner was allowed to amend his complaint to add Corrections Corporation of America of Tennessee, LLC ("CCA") as a defendant again (Docs. 13, 14); Garner alleges that CCA of Tennessee is the defendants' insurer because it pays all court-ordered awards to inmates. Although CCA was added as a defendant again, it was never served. Garner never completed a summons for CCA and no attempt was ever made to effect service. Accordingly, the complaint against CCA will be dismissed without prejudice under Fed.R.Civ.P. 4(m). See McGinnis v. Shalala, 2 F.3d 548, 550 (5th Cir. 1993), cert. den., 510 U.S. 1191, 114 S.Ct. 1293, 127 L.Ed.2d 647 (1994); Systems Signs Supplies v. U.S. Dept. of Justice, 903 F.2d 1011, 1013 (5th Cir. 1990); Kersh v. Derosier, 851 F.2d 1509, 1512 (5th Cir. 1988).

Defendants Lucas, Coleman, and Clark answered the complaint (Doc. 18). Garner filed a motion for summary judgment in September

2009 (Doc. 30) which was denied (Doc. 66).

An evidentiary hearing was held on the remaining issues in his case on March 31, 2011. After the hearing, all parties consented to have this case decided by the undersigned Magistrate Judge and agreed before the hearing that the hearing would serve as the trial in this case, since evidence was adduced on all remaining issues.

At the trial held on March 31, 2011, Garner moved to dismiss his claims against Clark and that motion was granted.

## Law and Analysis

### Denial of Medical Care Claims

1.

Under the Eighth Amendment, a lack of proper inmate medical care can be "cruel and unusual punishment" only if it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285 (1976). The Supreme Court defined "deliberate indifference" as "subjective recklessness," or in other words a conscious disregard of a substantial risk of serious harm. Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 1980 (1994). Because an inadvertent failure to provide adequate medical treatment does not violate the Eighth Amendment, deliberate indifference does not include a complaint that a physician has been negligent in diagnosing or treating a medical condition, Estelle, 97 S.Ct. at 291, or a difference of medical opinion between the prison's medical staff and the inmate

3

about what medicines or treatments the inmate should be receiving, Norton v. Dimazana, 122 F.3d 286, 292 (5th Cir. 1997).

A prison inmate can demonstrate an Eighth Amendment violation by showing that a prison official refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. Easter v. Powell, 467 F.3d 459, 464 (5th Cir. 2006), citing Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). A prison official is deliberately indifferent to serious medical needs of prisoners if he intentionally denies or delays access to medical care. Walker v. Butler, 967 F.2d 176, 178 (5th Cir. 1992); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).

2.

Garner contends defendants denied him medical care on July 28-31, 2008, resulting in a ruptured appendix, infection (gangrene and e-coli), and prolonged illness. Specifically, Garner contends in his complaint that Lucas and Coleman made the morning rounds in the Cypress Unit on July 31, 2008, saw Garner's red and swollen abdomen, laughed at his pleas for medical help, and walked away.

At trial, Garner testified that his abdominal pain began on July 28, 2008. Garner testified that he filled out a sick call request form with "emergency sick call" written at the top on July 29, 2008; Garner complained of abdominal pain. That sick call

4

request was not processed by the medical staff until August 1, 2008. Garner alleges he talked to mental health counselor Edward Lewis on July 30, 2008 about everything that made him depressed, including not getting medical help for his stomach pain,

Garner further testified that he filled out another sick call request form on July 31, 2008 and gave it to LPN Lesia Jones when she made her pill call rounds. LPN Jones testified that she then examined Garner at about 9 a.m. and filled out a health assessment form except for his temperature, because she was on pill call and not have a thermometer with her at the time. LPN Jones stated that Garner's pulse was a little high at 130, and that he complained of dizziness, pain, vomiting (including vomiting "something green") and feeling sick, but he did not appear to be in "acute distress." LPN Jones testified that she then compared his symptoms to a "protocol" chart provided to her at WCC; that chart instructed her to give Milk of Magnesia of Garner. LPN Jones never took Garner's temperature and did not contact a registered nurse or a medical doctor about Garner's symptoms.[1] LPN Jones testified at length as

---

[1] Under Louisiana law, a licensed practical nurse is not qualified or authorized by her license to make a diagnosis or prescribe medication. An LPN must work under the supervision of either a registered nurse or a medical doctor. The practice of practical nursing is defined in La. R.S. 37:961(b). See also, Louisiana State Board of Practical Nurse Examiners: Scope of Practice @ http://www.lsbpne.com/scope_of_practice.htm.
It appears the real problem in this case was caused by lack of supervision of the LPN and the gross inadequacies of the protocol which the LPN was given to follow, which effectively put the LPN in charge of diagnosing and prescribing. In a case of

to the procedures she was instructed to follow by her supervisor, Pat Thomas, in evaluating and treating inmates, and testified that she adhered to them when she evaluated and treated Garner. LPN Jones testified that, when an inmate declares a medical emergency, the medical staff is supposed to see the inmate immediately, but when the inmate turns in a regular sick call request form, the medical staff has three days to see the inmates. Finally, LPN Jones testified that, when she called the hospital on August 7, 2008 to check on Garner, she was told that he had peritoneal gangrene and e-coli, and remained on a morphine drip.

Garner testified at trial that, in his second sick call request and his complaints to LPN Jones, he stated that he had a swollen belly, abdominal pain that had worsened since Saturday, dizziness, and vomiting. Garner testified that, after checking him, LPN Jones gave him Maalox.

Garner testified at trial that, soon after he saw Jones, he saw Security Chief Virgil Lucas enter the Cypress Unit. Garner

---

serious medical need, such as Garner's, reliance on an LPN to assess and treat an inmate may be wholly inadequate. A prison or prison officials that provide medical care for inmates through an unsupervised LPN may be found to be deliberately indifferent to serious medical needs. See McRaven v. Sanders, 577 F.3d 974, 980-981 (8th Cir. 2009)(court noted without deciding whether an LPN was unqualified as a matter of law to determined whether or not inmate should have been hospitalized since LPN was not supervised by a more senior medical professional, and whether prison officials could reasonably rely on LPN's unsupervised medical opinion). There was no evidence adduced at trial as to who authorized the "protocol" the LPNs had to follow.

testified that he showed Lucas his stomach and requested an emergency sick call, but Lucas ignored him, walked past him, and sat by the Cypress Unit nurse's station. Lucas testified at trial that he visits the Cypress Unit daily, and that he did not ignore Garner. Lucas testified that he does his job, and it is part of his job to get medical care for inmates who are in distress. Lucas testified that he did not recall Garner in pain and in need of medical care because that incident did not happen. Lucas further testified that he did not know Garner had been sick and sent to the hospital until he became involved in this lawsuit.[2]

Garner testified that he also saw Capt. Coleman the morning of July 31, 2008; Coleman, the Cypress Unit manager, was escorting inmates in and out of the disciplinary courtroom. Garner testified that he showed Coleman his stomach and told him he needed medical care, but that Coleman was busy escorting inmates. Capt. Coleman testified that he had no independent recollection of Garner calling out to him for help, but that did not mean that Garner had not done so. Coleman further testified that, had he seen Garner on his knees in his cell, in pain, and yelling for help, he would have

---

[2] Lucas' testimony that he was unaware that Garner had been hospitalized for a ruptured appendix, and his testimony that he likes to stay abreast of everything that goes on in the prison, begs the question of whether Garner's denial of medical care claim was actually investigated at WCC. Since Garner was required to exhaust his administrative remedies as to this claim prior to filing his suit in federal court, WCC officials presumably investigated Garner's claim prior to denying it.

gotten Garner medical help. Coleman testified that, when an inmate in Cypress Unit makes a medical emergency, he has to be escorted by security to the infirmary. Coleman further testified that he was unaware Garner had suffered a ruptured appendix until about one week before the trial.

Garner testified that, after he was taken to the hospital, he had emergency surgery for his ruptured appendix. As a consequence of the ruptured appendix, Garner also had peritoneal gangrene and e-coli.[3]

---

[3] According to the National Library of Medicine and the National Institutes of Health, "[a]ppendicitis refers to inflammation of the appendix, a small pouch attached to the colon in the lower right abdomen that has no known function. The inflammation develops because of a blockage and infection in the appendix. Treatment involves surgery to remove the appendix to prevent it from rupturing. A ruptured appendix causes infectious material to spill into the abdomen, where it can lead to complications and boost patients' time in the hospital and medical costs." MEDLINEplus Health Information: "Ruptured Appendix More Common in Rural U.S.," *available at* http://www.nlm.nih.gov/medlineplus/news/fullstory_108519.html (a service of the U.S. National Library of Medicine and the National Institutes of Health).
    The American College of Surgeons explains further, at "Appendectomy, Surgical Removal of the Appendix", available through medlineplus.gov, a service of:

"Appendicitis is an infection of the appendix. The infection and swelling can decrease the blood supply to the wall of the appendix. This leads to tissue death, and the appendix can rupture or burst, causing bacteria and stool to release into the abdomen. This is called a ruptured appendix. A ruptured appendix can lead to peritonitis, which is an infection of your entire abdomen. ..."

"Appendectomy is the surgical removal of the appendix.

> "Symptoms
> -Stomach pain that usually starts around the navel and then often moves to the lower right side of the abdomen
>     -Loss of appetite
>     -Low fever, usually below 100.3°F
>     -Nausea and sometimes vomiting
>     -Diarrhea or constipation"

According to the MEDLINEplus Health Information, Medical Encylopedia: Appendicitis, *available at* http://www.nlm.nih.gov/medlineplus/encyclopedia.html (a service of the U.S. National Library of Medicine and the National Institutes of Health), the symptoms of appendicitis vary:

> "It can be hard to diagnose appendicitis in young children, the elderly, and women of childbearing age.
>
> "Typically, the first symptom is pain around your belly button. (See: Abdominal pain) The pain may be vague at first, but becomes increasingly sharp and severe. You may have reduced appetite, nausea, vomiting, and a low-grade fever.
>
> "As the inflammation in the appendix increases, the pain tends to move into your right lower abdomen and focuses directly above the appendix at a place called McBurney's point.
>
> "If your appendix ruptures, the pain may lessen briefly and you may feel better. However, once the lining of your abdominal cavity becomes inflamed and infected (a condition called peritonitis), the pain gets worse and you become sicker.
>
> "Your abdominal pain may be worse when walking or coughing. You may prefer to lie still because sudden movement causes pain.
>
> "Later symptoms include:
>     Chills
>     Constipation
>     Diarrhea
>     Fever
> Loss of appetite
> Nausea

9

Lucas and Coleman both testified that, when they saw Garner the morning of July 31, 2008, he did not appear to be in distress. They both testified that, had he been visibly in distress, they would have taken him to the infirmary.

Lt. Lang testified at trial that he was working in the Cypress Unit at about 3:00 p.m. on July 31, 2008, when he saw Garner in Tier A-1, Cell 1 kneeling on the floor, doubled over, crying and visibly in pain. Lt. Lang testified that Garner was obviously very ill and immediately escorted him to the infirmary for an emergency sick call. Lt. Lang also testified that Garner was housed in Unit A1, Cell 1, which is the first cell in the SHU and is located directly across from the doors to the Disciplinary Courtroom. Lt. Lang testified that anyone entering Unit A1 would necessarily pass by Cell 1, where Garner was housed, and that anyone exiting the disciplinary courtroom could see into Cell 1. Lt. Lang further testified that, to make a medical emergency, an inmate need only "declare" a medical emergency or state that he must see a doctor immediately, and the officers had to immediately escort the inmate to the infirmary. Lt. Lang testified that it does not matter whether the officer believes the inmate actually needs immediate medical care because the officers are not doctors. Lt. Lang further testified that anyone in the Cypress Unit can hear an

---

Shaking
Vomiting"

10

inmate cry out for help because the unit is small and made of concrete, so sound travels well and echoes in it.

Garner testified that inmate Milton Livas was in the infirmary with Garner the afternoon of July 31, 2008 and saw Garner vomiting; Livas did not recall any of the events. Livas' testimony was not credible.

On July 31, 2008, Dr. Pacheco noted that Garner had abdominal tenderness and referred him to the emergency room (Doc. 30, Ex. 13).

On August 1, 2008, WCC officials were advised by hospital officials that Garner was having surgery in one hour, that it was life-threatening, and that his family should be contacted (Doc. 30, Ex. 13). Garner survived the surgery and the gangrene and e-coli infections, remaining in the hospital on IV antibiotics for two weeks (Doc. 30, Ex. 15). Garner returned from the hospital on August 15, 2008 and remained in the infirmary at WCC (Doc. 30, Ex. 16).

Defendants argue they are not medical personnel, that the defendant medical personnel have already been dismissed from this case, and that if the medical personnel did not recognize a problem with Garner, the defendants should not have been expected to (Doc. 33-1). Defendants further argue that Garner should have made a sick call request if he felt bad (Doc. 33-2).

Defendants' argument ignores the fact that Garner needed to

make a medical emergency; a "sick call request" was too slow a procedure to deal with the emergency, as evidenced by the fact that he did, in fact, make a sick call request on July 28 that was not processed until August 1, after he went to the hospital.

Defendants further contend that Garner did not appear to be in distress when they saw him on the morning of July 31, 2008, and that he was not obviously ill until Lt. Lang saw Garner the afternoon of July 31, 2008. Defendants also argue that LPN Jones saw Garner in his cell on July 31, 2008 at 9:40 a.m., found him in "no acute distress," and gave him medications for constipation (Doc. 33).

First, it is noted that, although LPN Jones wrote that Garner was in no acute distress, she also wrote that Garner had not had a bowel movement for about eight days, he said felt "real sick," his pulse was 130, his skin was warm, he was dizzy, he had pain all around the lower part of his abdomen, and he told her he had thrown up something green (Doc. 30, Ex.).

Garner's medical records show that, when Garner arrived at the hospital on July 31, 2008, he was past the stage of merely having appendicitis[4]; his appendix had already ruptured and he had

---

[4] Appendicitis is a painful swelling and infection of the appendix. MEDLINEplus Health Information, "Appendicitis," available at http://digestive.niddk.nih.gov/ddiseases/pubs/appendicitis/index.htm (a service of the National Institutes of Diabetes and Digestive and Kidney Disease, National Institutes of Health).

12

peritoneal gangrene and e-coli as a result. The medical records from Huey P. Long Hospital show Garner reported seven days of increasing pain with a slow onset (Doc. 79).[5] The doctor noted that Garner's abdomen was distended all over and tender and he diagnosed acute appendicitis (ruptured appendix) (Doc. 79). Garner's preoperative diagnoses was acute abdomen, probable ruptured appendix, and his post-operative diagnosis was ruptured appendix (Doc. 81, p. 83). The doctor wrote that, because Garner's appendix was ruptured (and abscessed), he was in the hospital for 15 days (Doc. 79).

Although an LPN has very little formal training and is not qualified to make a diagnosis, defendants believe LPN Jones sufficed to provide medical treatment for Garner on the morning of July 31. LPN Jones evaluated Garner, noted that Garner had abdominal pain "all around," his skin was pink and warm (but his temperature was not taken), and his pulse was 130, but did not feel he needed further care; LPN Jones ordered stool softeners and Milk of Magnesia® for Garner.

Defendants contend Garner's "medical distress" was not so

---

[5] The undersigned asked defendants to provide Garner's medical records from Huey P. Long Hospital. Although Garner spent 15 days in the hospital due to his ruptured appendix, and had surgery, defendants filed only four pages of medical records (Doc. 79). Upon order of the court, defendants submitted additional hospital medical records (Doc. 81).

obvious that an LPN or a layperson would see it.[6] However, by 3:15 p.m. on July 31, Garner was obviously very ill; Lt. Lang saw his distress and immediately took him to the infirmary, from which Dr. Pacheco immediately sent him to the hospital, where he was diagnosed with acute appendicitis.

According to Garner's motion, defendants ignored his requests for medical care during a life-threatening illness and walked away from him. Such behavior constitutes deliberate indifference to serious medical needs. Defendants argue that, if the medical personnel, who have been dismissed from this case, did not recognize the Garner was ill, why should they be held responsible for recognizing it and liable for failing to do so.

First, the only "medical staff" to see Garner before he was taken to the infirmary was an LPN; under Louisiana law, a licensed practical nurse is not qualified or authorized by her license to make a diagnosis or prescribe medication.[7] Therefore, to the extent that officials at WCC/CCA rely on LPNs to diagnose and

---

[6] Michelle Kennedy, a social worker, states in her affidavit that she saw Garner at 12:45 p.m. on July 31, and did not observe him to be in physical distress. However, a social worker is not a medical professional.
  Moreover, it is noted that the mental health evaluation forms and suicide watch forms used by the social workers and other personnel at WCC did not contain any reference checks for the physical health of the inmate (Doc. 33).

[7] The practice of practical nursing is defined in La. R.S. 37:961(b). See also, Louisiana State Board of Practical Nurse Examiners: Scope of Practice @ http://www.lsbpne.com/scope_of_practice.htm.

14

prescribe, they are risking much in liability.

To the extent that defendants argue that medical malpractice, or negligent medical care, does not constitute deliberate indifference under the Eighth Amendment, it is noted that providing an LPN to perform the diagnostic duties of a physician for inmates is neither negligence nor medical malpractice; it is a failure to provide appropriate medical care to the inmates for which responsible prison officials may be liable to any inmate harmed thereby. Compare Rice v. Chandler, 2008 WL 1832214 (W.D.Ky. 2008).

In the case at bar, Garner alleges that he told each defendant he needed to make an emergency sick call. Simply sending an LPN to look at Garner and make a "diagnosis" was not providing Garner with medical care. Since neither the security officers nor the nursing staff were qualified to diagnose Garner's medical problems, he should have been permitted to make the emergency sick call in the infirmary. If, as Garner points out, the emergency sick call was not justified, he could properly have been punished through disciplinary proceedings. However, ignoring Garner or sending an LPN to "evaluate" his symptoms and make a diagnosis, was obviously not the correct way to handle his request to make an emergency sick call. Therefore, the fact that the medical staff has been dismissed does not excuse the security staff defendants from liability for failing to handle Garner's request for an emergency sick call correctly.

Garner was clearly symptomatic the morning of July 31, 2008-he had a ruptured appendix with an abscess. Appendicitis creates a sharp, very severe pain prior to rupturing; although it may have lessened briefly immediately prior to rupture, his pain would have worsened when his appendix ruptured and as his abdominal cavity became infected by the contents of his intestines, resulting in gangrene. Therefore, it is very difficult for the undersigned to believe that Garner was not in any visible signs of distress on the morning of July 31, 2008. If Garner told the defendants (and apparently everyone else nearby that morning) that he was in pain, that statement would have been accurate. There is simply no way that Garner was not experiencing severe abdominal pain, either in the hours leading up to or after his appendix ruptured and abscessed.

Therefore, the undersigned concludes that the testimony of defendants Lucas and Coleman, that Garner was not in any visible distress on the morning of July 31, 2008, is not credible. Defendants' neglect of Garner resulted in several additional hours of pain and suffering for Garner. Defendants' actions in ignoring Garner's obvious distress constituted deliberate indifference to his serious medical needs. Therefore, defendants Lucas and Coleman are liable to Garner for denial of medical care.

**Accordingly,**

Garner's complaint against CCA is DISMISSED WITHOUT PREJUDICE

pursuant to Fed.R.Civ.P. 4(m) for lack of service.

Garner's motion to dismiss Clark is GRANTED and his action against Clark is DISMISSED WITH PREJUDICE.

Garner's request for compensatory damages against Lucas and Coleman is GRANTED. Lucas and Coleman are JOINTLY LIABLE TO GARNER FOR $5,000 FOR GARNER'S UNDULY PROTRACTED PAIN AND SUFFERING, AS WELL AS COSTS OF THIS SUIT AND JUDICIAL INTEREST. Garner's requests for punitive damages and injunctive relief are DENIED.

THUS DONE AND SIGNED at Alexandria, Louisiana, on this 18th day of May 2011.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE